UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
DEBORAH BOGDAN, :
:
Plaintiff, :
: 02 Civ. 09587 (GEL)
v. :
: **OPINION AND ORDER**
:
NEW YORK CITY TRANSIT AUTHORITY, :
:
Defendants. :
------------------------------------------------------------x

John Beranbaum, Todd A. Krichmar, Beranbaum Menken Ben-Asher & Bierman LLP, New York, New York, for plaintiff.

Martin Schnabel, Robert K. Drinan, General Counsel, New York City Transit Authority, Brooklyn, New York, for defendant.

GERARD E. LYNCH, District Judge:

Plaintiff Deborah Bogdan brings this employment discrimination action against her former employer, the New York City Transit Authority ("TA"). Plaintiff alleges she was suspended and subsequently terminated for filing a charge of sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("Human Rights Law"); and the New York City Human Rights Law, New York City Administrative Code §§ 8-101 *et seq.* ("Administrative Code"). Plaintiff also brings an action under 42 U.S.C. § 1983 for violations of the First Amendment and Equal Protection Clause of the United States Constitution. Defendant now moves for summary judgment on the grounds that plaintiff cannot prove that her harassment complaint was a protected activity, or demonstrate that defendant's alleged non-discriminatory

reasons for her termination are pretextual. Defendant also argues that plaintiff's § 1983 claim fails as a matter of law, and that the TA is exempt from the Administrative Code. For the reasons below, defendant's motion will be granted.

## BACKGROUND

I. <u>Plaintiff's Sexual Harassment and Retaliation Claim</u>

Bogdan alleges that she was fired in retaliation for her sexual harassment claim against Joseph Mendola, a fellow employee in the TA's Capital Program Management unit ("CPM").[1] Bogdan was employed by the TA from 1994 until her termination on January 28, 2002. (Bogdan Tr. 22-23.) Starting around September 2000, Bogdan and Mendola struck up a consensual friendship. (Id. at 220.) Mendola, a married man, was a high-ranking employee but not Bogdan's supervisor. Bogdan denies that the two shared a romantic relationship, but acknowledges that she had dinner with Mendola on several occasions on which he paid, and that she accepted various gifts from him, including Tiffany gold earrings on Valentine's Day, and a cell phone, calculator, and Palm Pilot that turned out to be TA property. (Id. at 221-23.)

On April 17, 2001, Bogdan became engaged and informed Mendola. She alleges that he reacted poorly, screaming at her and stating that he loved her. (Bogdan Tr. 278; Bogdan II Tr. 31.) The next day he left an unwanted letter by her work telephone. On April 23, 2001, he left a second letter for her, and attempted to give her two Russian hats and a videotape. (Bogdan Tr. 247-51.) About one week later, on April 29, 2001, Mendola's wife began a series of aggressive phone calls, accusing Bogdan of having an affair with Mendola and breaking up the Mendolas'

---

[1] Bogdan does not assert in this Court a claim for sexual harassment or hostile working environment.

marriage. Due to Mrs. Mendola's detailed knowledge of Mendola and Bogdan's relationship, Bogdan believed that Mendola had provided his wife with this information. (Bogdan Tr. 257.)

On April 30, 2001, after another phone call from Mendola's wife the previous night, Bogdan informed her supervisor, Bill Ciaccio, that Mendola's wife was calling her, and that Mrs. Mendola was saying that Bogdan was using TA property, referring to the cell phone and other gifts that Mendola had given her. (Id. at 265.) The next day, on May 1, 2001, Ciaccio took Bogdan to the Chief Administrative Officer, Patrick Marmo. Marmo and Judith Buckley, an attorney and director of the labor relations unit for CPM, suggested that she file a complaint against Mendola. (Bogdan Tr. 274-75.) The TA treated and investigated Bogdan's complaint as a sexual harassment complaint. (Marmo Tr. 72-73; Buckley Tr. 74-75.) Bogdan also filed a harassment charge with the police against Mendola's wife. On June 6, 2001, the TA completed its investigation, concluding that there had been no sexual harassment. After the TA became aware of Bogdan's use of the TA cell phone, Bogdan was required to reimburse the TA for $300 in cell phone charges. (Bogdan Tr. 283.) For giving Bogdan the cell phone and other equipment, Mendola was demoted for one year. The period was later reduced to two weeks, which he testified was the equivalent of a pay loss of $5,000. (Mendola Tr. 95.) After she filed her complaint, Bogdan alleges that Ciaccio's behavior towards her changed. For example, he allegedly became sarcastic, critical and insulting, encouraged Bogdan to quit, made veiled threats about her job, and subjected her to various other acts of hostility. (Bogdan II Tr. 96-101.)

II. <u>Plaintiff's Work History at the TA</u>

During her tenure at the TA, Bogdan worked in a number of departments, serving under at least four separate supervisors. She was first hired as a provisional appointee as an Associate

Staff Analyst, a position that included budgetary and administrative work, in the Communications Department. (Bogdan Tr. 22-25.) She received a positive evaluation in 1997 from her then supervisor, Paul Eliea. (D. Rule 56.1 Stmt. Ex. C at 1-4.) After Eliea was promoted in 1998, Michael Purazzo supervised Bogdan. (Bogdan Tr. at 45.) In addition to complaining about Bogdan's failure to fill out sick leave forms and her neglect in balancing the petty cash correctly, Purazzo criticized the quality of Bogdan's work, specifically the failure to timely renew a contract. (Id. at 46-47.) During a meeting discussing this contract, Bogdan testified that she left in the middle of the meeting to go to Eliea's office to discuss the contract issue with Eliea (id. at 67-69), explaining that Purazzo was incorrect about the contract's expiration date. (Id. at 50, 64.) Bogdan contends that any difficulties with Purazzo arose because while she was under Eliea's supervision, Eliea asked her to investigate Purazzo, and Bogdan later had publicly announced that she did not want to work for Purazzo. (Id. 34, 37-40.)

In December 1998, Bogdan requested a transfer to Stations Rehabilitation in CPM, headed by Bill Madden. (Id. at 83.) Her immediate supervisor was Ed Feizbakhsh. (Id. at 113.) In May 1999 and August 2000, Feizbakhsh submitted reports detailing her alleged performance failures, including her inability to meet certain deadlines. (See D. Rule 56.1 Stmt. Ex. C at 28, 29.) Bogdan submitted a response to the second report, objecting to Feizbakhsh's criticisms, accusing Feizbakhsh of harassment, and requesting a transfer. (Id. at 23.)

In August 2000, Marmo and Buckley granted her request to transfer to Line Equipment, Shops and Yards, a division also under CPM which was under the management of Bill Ciaccio. (Bogdan Tr. 178-80; Marmo Tr. 60-61, 152-53.) In this unit, Bogdan had several immediate supervisors, including Kris Menon and Sonia Jaising. (Bogdan Tr. 181-82, 189.) In 2002, on the

day Bogdan was suspended, Jaising wrote a memorandum stating that she had requested that Bogdan be reassigned away from her area due to her inability to complete assigned projects. (D. Rule 56.1 Stmt. Ex. C at 33.) A few weeks prior to Bogdan's suspension, on December 28, 2001, Menon also wrote a memo, explaining that after Bogdan's full-time reassignment to her area, based on Jaising's request, Bogdan required a lot of supervision to complete tasks. Menon alleged that Bogdan had unprofessional work habits, including spending too much time on telephone calls and not following a fixed work schedule. (Id. at 35.)

Around January 14, 2002, Ciaccio asked Bogdan to prepare a report for him. He was dissatisfied that she was not completing it in a timely fashion (Ciaccio Tr. 82-85), while Bogdan felt that Ciaccio kept giving her conflicting instructions. (Bogdan II Tr. 62-63.) Ciaccio consulted Buckley, and wrote two memos. One memo warned Bogdan about her performance, while the other directed her to take lunch only between the hours of 12 noon and 2 p.m. (See D. Rule 56.1 Stmt. Ex. C at 91-92.) On January 15, 2002, seven months after Bogdan filed her complaint about Mendola, Ciaccio brought Bogdan the memos and requested that sign she them. Bogdan refused, and admits that she informed Ciaccio that she thought the memos were "ridiculous." (Bogdan Tr. 83-86.)

On January 16, 2002, in a meeting with Ciaccio, Marmo, and Buckley, Bogdan was asked again if she would sign the memos. During the meeting, Marmo told Bogdan, "You know, this is not the first time that you have had trouble. You have been in this office approximately . . . eight or nine months . . . with that sexual harassment and you know that Joe Mendola . . . ." (Bogdan II Tr. 83.) Buckley then put up her hand and told Marmo, "Shh." (Id.) When Bogdan refused to sign the memos, she was suspended indefinitely, and then escorted out of the building. Bogdan

5

later received a letter, informing her that she was fired as of January 28, 2002.

## DISCUSSION

I.     Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion."  Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  In addition, the court is not to make any credibility assessments or weigh the evidence at this stage.  Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

The nonmoving party, however, may not rely on "conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd.,  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and must make a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

II.  § 1983 Claim

Plaintiff brings a cause of action under 42 U.S.C. § 1983, based on an alleged violation of the First Amendment and Equal Protection Clause. (Compl. ¶ 71.) To succeed on a § 1983 claim against a municipality,[2] plaintiff must prove a deprivation of a federal right that resulted from a custom or official policy. Monell v. Dep't of Social Serv., 436 U.S. 658, 694 (1978); Zahra v. Southold, 48 F.3d 674, 685 (2d Cir. 1995). A municipality cannot be held vicariously liable under § 1983 for the actions of its employees under respondeat superior. Monell, 436 U.S. at 691; Zahra, 48 F.3d at 685. Defendants persuasively argue that the facts fail to demonstrate an illegal custom or policy. Plaintiff fails to respond to defendant's arguments, and has thus abandoned her claim. Therefore, summary judgment is granted on plaintiff's § 1983 claim.

III.  Retaliation Claim

A.  Legal Standard

In Title VII discrimination cases, including retaliation cases, the courts have established a complex burden-shifting framework based on McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to determine whether a plaintiff's claim survives summary judgment. Employment retaliation claims under New York State and New York City laws are analyzed utilizing the same framework. Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001).

First, the plaintiff must make a prima facie showing of retaliation. McDonnell Douglas, 411 U.S. at 802; Feingold v. New York, 366 F.3d 138, 156-57 (2d Cir. 2004). The burden of establishing a prima facie case is not onerous, and is frequently described as minimal. Scaria v.

---

[2] Plaintiff also filed a complaint against Bill Ciaccio and Patrick Marmo, but these two individuals were later dismissed.

Rubin, 117 F.3d 652, 654 (2d Cir. 1997). See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). To establish a prima facie case of unlawful retaliation, plaintiff must show that (1) plaintiff participated in a protected activity; (2) defendant was aware of the activity; (3) plaintiff experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. Feingold, 366 F.3d at 156.

Meeting the burden of establishing a prima facie case "creates a presumption that the employer unlawfully discriminated." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its adverse employment action. McDonnell Douglas, 411 U.S. at 802; James, 233 F.3d at 154. That burden "requires the defendant to produce admissible evidence showing 'reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action,'" Eatman v. United Parcel Serv., 194 F. Supp. 2d 256, 263 (S.D.N.Y. 2002), quoting St. Mary's Honor Ctr., 509 U.S. at 507 (emphasis in original). If the employer fails to present such a reason, plaintiff prevails.

Once the employer articulates a non-discriminatory reason, the presumption "drops out of the picture." St. Mary's Honor Ctr., 509 U.S. at 510-11. The plaintiff is then required to show that the proffered reason is a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804. When the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000), quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

B. <u>Exemption from the New York City Administrative Code</u>

The TA is a public benefit corporation, created to acquire transit facilities, operate them "for the convenience and safety of the public," and ensure the "continuance, further development and improvement of commuter transportation and other services related []to . . . the metropolitan commuter transportation district and . . . a unified mass transportation policy." N.Y. Pub. Auth. L. § 1202(1). Defendant argues that the TA is exempt from the provisions of the Administrative Code due to New York Public Authorities Law § 1266(8), which states:

> [N]o municipality or political subdivision, including but not limited to a county, city, village, town or school or other district shall have jurisdiction over any facilities of the . . . New York [C]ity [T]ransit [A]uthority and its subsidiaries, or any of their activities or operations. The local laws . . . conflicting with this title or any rule or regulation of the . . . New York [C]ity [T]ransit [A]uthority . . . shall not be applicable to the activities or operations[,] . . . except such facilities that are devoted to purposes other than transportation or transit purposes.

Defendant's effort to avoid liability based on this statute is unconvincing.

In interpreting statutes, a court "should attempt to effectuate the intent of the Legislature and where the statutory language is clear and unambiguous, the court should construe the statute to give effect to the plain meaning of the words used." Eaton v. N.Y. City Conciliation and Appeals Bd., 56 N.Y.2d 340, 345 (1982) (internal citations omitted). Here, the amendment states that "no municipality or political subdivision . . . shall have jurisdiction" over the TA, yet in the next sentence, states that any "local laws . . . conflicting with this title or any [TA] rule or regulation . . . shall not be applicable" to the TA, except with respect to non-transportation facilities – a seeming qualification of the previous sentence. N.Y. Pub. Auth. L. § 1266(8). If the Legislature meant literally that no local law should apply to the TA, it would be unnecessary

9

to provide that only local laws that "conflict[ed]" with the Public Authorities Law should be inapplicable, and then, only as to "facilities . . . devoted to . . . transportation and transit purposes." Id. It would then appear that the Legislature did not intend to prohibit the application of all local laws to the TA, but only of such laws that interfered with the accomplishment of its transportation purposes.

This interpreetatino is supported by New York case law. The New York Court of Appeals held in Levy v. City Comm'n on Human Rights, 628 N.Y.S.2d 245 (1995) that the Public Authorities Law, as it then existed, only exempted the TA from the reach of local laws that "interfere with the accomplishment" of the TA's purpose, and found that compliance with local human rights laws do not interfere with the TA's purpose. Levy, 628 N.Y.S.2d at 248. See also Wahlstrom v. Metro-North Commuter R.R. Co., 89 F. Supp. 2d 506, 527 n.21 (S.D.N.Y. 2000) (adopting the New York Court of Appeals holding that the Public Authorities Law was consistent with the Administrative Code, and finding that the state legislature had not preempted the area of human rights).

The TA argues, however, that Levy is no longer good law, pointing out when Levy was decided, § 1266(8) applied only to the Metropolitan Transportation Authority ("MTA") and not to the TA. According to the TA, the amendment of § 1266(8) in May 2000 that inserted the TA had the effect of overruling Levy. (D. Mem. 27.) This argument finds no support in the case law. Both before and after the May 2000 amendment, courts have interpreted § 1266(8) in accord with Levy. Thus, in Wahlstrom, decided before the amendment, Judge Leisure applied Levy's analysis to hold that the MTA was subject to the city's anti-discrimination laws, rejecting the argument that the MTA's exemption from local laws under § 1266(8) was total. Wahlstrom,

10

89 F. Supp. 2d at 527 n.21.

Similarly, several New York courts have recently held that the TA is not exempt from certain liability under the Public Authorities Law, based on the continued vitality of Levy even after the amendment. In Rios v. Metro. Transp. Auth., No. 13206/03, 2004 WL 3093154 (Richmond Co. Sup. Ct. Dec. 22, 2004), the TA, as it does here, cited § 1266(8) and various cases that the New York City Commission on Human Rights dismissed for lack of jurisdiction, based on that statute. Id. at *3. Nevertheless, the court, citing Levy, declined to dismiss the complaint absent evidence that compliance with the local laws and regulations prohibiting employment discrimination would interfere with the public authorities' function and purpose. Id. In another case, the Appellate Division cited Levy in holding that the TA could be sued for personal injuries allegedly caused by violation of local safety regulations, reasoning that "compliance with minimal escalator safety requirements would hardly interfere with the Transit Authority's purpose." Huerta v. N.Y. City Transit Auth., 735 N.Y.S.2d 5, 10 (1st Dept. 2003). Finally, in Everson v. N.Y. City Transit Auth., 216 F. Supp. 2d 71 (E.D.N.Y. 2002), after analyzing the interaction between Levy and the addition of the TA to § 1266(8), Judge Glasser found "no reason to conclude that" as a result of the 2000 amendment, "the New York Court of [A]ppeals would today decide that the [TA] is exempt from the reach of the [anti-discrimination provisions of the] New York City Administrative Code." Id. at 80-81. In sharp contrast, the TA cites no judicial authority holding that the May 2000 amendment to § 1266(8) exempts it from complying with the City's anti-discrimination laws.

In light of this consistent line of authority, the Court concludes that § 1266(8) exempts the TA only from local laws that conflict with the TA's status as an independent agency charged

with the vital mission of providing transportation services. Since "[i]t cannot be seriously contended . . . that compliance with the prohibitions against employment discrimination would interfere with [the TA's] function and purpose," Levy, 628 N.Y.S.2d at 248, the TA's claim of exemption from the anti-discrimination provision of the New York City Administrative Code is rejected.

    C.    Merits

As discussed above (see Part III.A), plaintiff must meet four criteria to make a prima facie case of retaliation. Bogdan easily meets two of the criteria: The TA was aware of her complaint (as it was filed internally), and she was ultimately fired. Defendants argue that plaintiff's complaint was not a protected activity, and that there is no causal connection between her complaint and termination.

To prove that plaintiff's filing of her complaint to the labor relations department was a protected activity, she must establish a good faith, reasonable basis for her harassment complaint. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). For a plaintiff to succeed on a claim of sexual harassment, she must first demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992). Second, plaintiff must also impute the hostile environment to the employer. Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). However, plaintiff is to be held to a "lay person's" understanding of what constitutes sexual harassment. Carter v. Rosenberg & Estis, P.C., 95 Civ. 10439 (DLC), 1998 WL 150491, at *12 (S.D.N.Y. March 31, 1998). Even if the actions complained of do not constitute sexual harassment under the law, it is still possible for an

employee to reasonably believe that the treatment was sexual harassment. Quinn, 159 F.3d at 769.

Here, plaintiff testified to a series of incidents occurring over a period of several weeks. If plaintiff's testimony is taken as true, as it must when evaluating a summary judgment motion, Mendola yelled at Bogdan, refused to leave her cubicle, and left her two unwanted love letters and gifts. Plaintiff testified that Mendola's actions dramatically changed her work environment, and while limited in time frame, Mendola's actions were more than just one isolated incident. Even if these actions are insufficient to form the basis of a viable sexual harassment claim, a reasonable person in Bogdan's position could believe that Mendola's actions were an attempt to intimidate plaintiff to resume a relationship with him, thus providing a reasonable basis for filing a sexual harassment complaint.

Moreover, when Bogdan contacted her supervisor, Ciaccio, on May 1, 2001 after receiving a call from Mendola's wife the night before, Ciaccio suggested that they go to the labor relations unit. Buckley and Marmo, key individuals responsible for labor relations in the CPM, then encouraged her to file a sexual harassment complaint. (Bogdan Tr. 274-75.) Plaintiff's reliance on the TA's own suggestion that she file a complaint supports a finding that her complaint was reasonable and in good faith. Defendant argues that the timing of plaintiff's complaint "reek[s] of bad faith," and is an attempt to deflect attention away from her unauthorized use of TA property (D. Mem. 12), but plaintiff denies knowing that the cell phone belonged to the TA. Therefore, whether plaintiff filed her claim in good faith is ultimately an issue of material fact appropriate for a jury.

The fourth factor, causation, presents a more troublesome hurdle for Bogdan. A plaintiff

can demonstrate causation through circumstantial evidence, such as the timing of the adverse employment action, or through direct evidence of retaliatory animus. Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). However, plaintiff was suspended seven months after filing of her complaint. Courts are reluctant to infer retaliation where an adverse action takes place long after the filing of a charge, and the Second Circuit has held that three months can be too long a period to infer a causal relationship. See Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990). Additionally, it was Ciaccio, supported by Buckley and Marmo, who instigated the process by which Bogdan's complaint about Mrs. Mendola's abusive telephone calls – which under no circumstances could be construed as part of a sexual harassment complaint – was transmitted to, and treated by the TA as a harassment complaint against Mendola. These circumstances severely undercut any claim that Bogdan's much later termination was causally related to her complaint about Mendola.

However, plaintiff contends that her supervisor quickly started to treat her differently after she filed the complaint. For example, plaintiff alleges that Ciaccio became sarcastic, cynical, and insulting, by checking on her at home while she was on her honeymoon, accusing her of shopping during work hours, and telling her that she should go to England to join her husband. (Bogdan II Tr. 96-98.) Bogdan also testifies that Marmo referred to the Mendola incident at the termination meeting. Under these circumstances, plaintiff arguably has presented sufficient evidence, when viewed in the light most favorable to plaintiff, that supports a finding of a causal connection to establish a prima facie case of retaliation.

Nevertheless, even if Bodgan has barely established her prima facie case (a close question the Court need not decide), her retaliation claim fails as she falls far short of meeting her burden

to show that defendant's proffered reasons for her firing are pretexual.  Defendant demonstrates, and plaintiff does not dispute, extensive evidence of legitimate, non-discriminatory reasons for plaintiff's suspension and later termination.  (See P. Mem. 16.)  Repeatedly, Bogdan's supervisors complained about her poor job performance, and each time, Bogdan attributed the complaints to some form of retaliation or harassment.  In 1998, she worked for Mike Purazzo, who accused her of several derelictions, including failing to renew an important contract; Bogdan claimed that Purazzo was retaliating against her.  In December 1998, she was transferred to the supervision of Ed Feizbakhsh.  Feizbakhsh twice submitted reports critical of her performance; Bogdan filed a harassment claim shortly after these reports were submitted.  In August 2000, she transferred to Ciaccio's unit.  Subsequently, both he and her immediate supervisors also alleged poor performance and insubordination.  While plaintiff offers explanations for each complaint of poor performance, defendant has provided sufficient evidence in the form of documents and testimony to meet its burden of articulating a legitimate, non-retaliatory reason for terminating plaintiff.

Plaintiff fails to meet her burden of showing that the TA's asserted legitimate reasons were pretextual.  A retaliatory motive must be substantial to support a finding of pretext.  Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001).  As noted above, the evidence of retaliation here is thin at best.  The actions taken against Bogdan came many months after the filing of the complaint against Mendola, which, by Bogdan's own account, was supported by Ciaccio and Marmo, and investigated seriously by the TA.  Bogdan also does not materially dispute the accuracy of the charges brought by Ciaccio, or the fact that the other supervisors had repeatedly criticized her work.

A plaintiff may demonstrate pretext by illuminating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that would raise doubt in the factfinder's mind that the employer did not act for those reasons. Brierly v. Deer Park Union Free School Dist., 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005). For example, "showing that similarly situated employees belonging to a different . . . group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext." Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000).

Plaintiff here presents evidence of other individuals who were also terminated, but does not provide much detail to engage in a valid comparison. While it is true that comparators need not be identical to plaintiff, they must have a "reasonably close resemblance of the facts and circumstances of plaintiff" in "all material respects." Id. at 40; Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997). Bogdan's argument that the individuals cited were terminated for far worse actions than hers while she was terminated for "lesser offenses" is unpersuasive. (P. Mem. 21.) Plaintiff refers to individuals who misused their computers, either to access pornography or to run a side business on company time, and individuals who committed fraud and forged signatures and documents. (P. Mem. 22.) Yet plaintiff admittedly misused TA equipment against company policy. For giving her the TA equipment, Mendola was severely sanctioned through a demotion, considered to be a serious penalty. (Buckley Tr. 133.) More importantly, to demonstrate disparate treatment, plaintiff must show individuals who were similarly situated but received *more favorable* treatment. Graham, 230 F.3d at 43. Just because other individuals were fired after committing more serious infractions does not mean that

16

plaintiff's actions did not also warrant termination. Plaintiff provides no examples of individuals with poor performance records who were treated more favorably than plaintiff. Therefore, plaintiff's comparisons do not support a finding of pretext.

Plaintiff also argues that the TA deviated from the CPM's normal personnel practices. (P. Mem. 19-20.) See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 51 (2d Cir. 1998) (determining that a jury could find that the inconsistent application of disciplinary policy was sufficient for a finding of pretext). Once again, however, plaintiff compares herself to an individual who allegedly had a worse record of absenteeism and threatening behavior who was then transferred to another unit, an uninstructive comparison. (P. Mem. 20.) CPM's stated policy is to transfer staff members whose assignment "does not work out because of personalities of the people involved, or if the employee's work is unsatisfactory." (Beranbaum Aff. Ex. 2 at 2.) In fact, plaintiff was subject to this exact procedure, having transferred out of two departments. Bogdan provides no evidence that the transfer policy required that an unsatisfactory employee be permitted a third strike.

Bogdan's only potential evidence of pretext concerns the reference to Mendola at the meeting preceding her firing. Bogdan testifies that at the January 16, 2002 meeting, Marmo stated that Bogdan had trouble before at the CPM, in particular with the sexual harassment issue and Mendola. Buckley then put up her hand and said "Shh" to quiet him. (Bogdan II Tr. 83.) However, Marmo's remark does not specifically reference Bogdan's complaint, but appears to refer to the whole incident with Mendola. The TA handled Bogdan's complaint in an appropriate fashion, by encouraging her to file a formal complaint, conducting an investigation, and ultimately reaching a decision (which Bogdan does not dispute) that no sexual harassment had

occurred, while seriously disciplining Mendola for violating TA policies. It is simply implausible that Ciaccio, Marmo, and Buckley, having encouraged Bogdan to file a harassment complaint against Mendola, then conspired for many months to retaliate against her for that very complaint. Subsequent to the investigation, plaintiff was disciplined by being required to repay the TA $300 for misuse of its cell phone. The TA had the opportunity at that time to impose further sanctions, and in fact, it imposed an even more severe sanction on Mendola. While Buckley testified that she felt that Bogdan had filed the complaint in bad faith (see Buckley Tr. 120), there is no evidence that the complaint had "any relationship to the decision to discharge [p]laintiff." Carrion v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO, 03 Civ. 1896 (THK), 2005 WL 659321, at *14 (S.D.N.Y. March 21, 2005). Therefore, plaintiff does not meet her burden of showing that defendant's asserted legitimate reasons were pretextual, and defendant's motion for summary judgment on the retaliation claim is granted.

## CONCLUSION

Defendant's motion for summary judgment is granted with respect to all of plaintiff's claims.

SO ORDERED.

Dated: New York, New York
      May 13, 2005

_____
GERARD E. LYNCH
United States District Judge